395-14/MEU
FREEHILL HOGAN & MAHAR LLP
Attorneys for Petitioner
Jiangsu Steamship Co., Ltd
80 Pine Street
New York, NY  10005
Tel.: (212) 425-1900
Fax: (212) 425-1901
Michael E. Unger
Susan Lee
Email: unger@freehill.com
       lee@freehill.com



14 CV 9997

JUDGE McMAHON

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

IN RE THE PETITION OF JIANGSU STEAMSHIP
CO., LTD

REQUEST FOR DISCOVERY PURSUANT TO 28
U.S.C. § 1782

------------------------------------------------------------x

14 Misc. _____ (___)(___)

## PETITION FOR AN ORDER ALLOWING
## DISCOVERY PURSUANT TO 28 U.S.C. § 1782

Petitioner, Jiangsu Steamship Co., Ltd ("Petitioner" or "JSCL"), by and through its undersigned counsel, applies for an Order pursuant to 28 U.S.C. §1782 to obtain discovery by way of subpoenas requiring the production of relevant documents in the possession, custody and/or control of certain banks and investment companies located within the Southern District of New York (hereinafter collectively referred to as "New York Banks"), for use in foreign proceedings, for purposes of locating assets of Success Superior Limited, a foreign corporation with links to New York which has failed to pay sums due under an English arbitral award as further set out in the accompanying Declaration of English counsel Su Yin Anand and the Memorandum of Law submitted with this Petition.

1

426548.1

1. Jurisdiction is proper pursuant to 28 U.S.C. § 1782 as this application is for discovery involving documents located within the Southern District of New York which are necessary to assist Petitioner in foreign court proceedings.

2. At all times material herein, JSCL is and was a foreign business entity organized under the laws of a foreign state with an address at China.

3. Venue in the Southern District of New York is appropriate pursuant to Title 28 United States Code Section 1782 because the requested discovery will be sought from business entities present within this judicial district, along with the documents being presently in this jurisdiction.

## FACTUAL BACKGROUND

4. On or about April 4, 2014, JSCL, as disponent owner of the M/V JIAN HUA, entered into a maritime contract of charter party with Success Superior Limited to carry 70,000 metric tons of iron ore in bulk on board the M/V JIAN HUA from Manzanillo, Mexico to a port in North China. (*See* Exhibit A, copy of Declaration of Su Yin Anand In Support Of Petition at ¶¶ 4 and 6 and Ex. 1 thereto).

5. Success Superior Limited's performance of the charter party was and is guaranteed by Mingli International Group S. de R.L. de C.V. ("Mingli"). (*See* id.).

6. The charter party is governed by English law and provides for any disputes arising between the parties to be referred to arbitration in London. (*See* id. at ¶ 5 and Ex. 1 thereto).

7. JSCL duly delivered the vessel to Success Superior Limited and duly performed all of its obligations in accordance with the terms the charter party. (*See* id. at ¶ 7).

426548.1

8. Due to no fault of Petitioner, when the vessel arrived at Manzanillo to load the cargo of iron ore, the vessel was detained and the cargo was impounded by local authorities as a result of an alleged discrepancy in the export documentation. (*See* id. at ¶ 8).

9. Despite due demand, Success Superior Limited refused or otherwise failed to pay certain sums to Petitioner in breach of the charter party. (*See* id. at ¶ 9).

10. Owing to the breach of the charter party by Success Superior Limited, JSCL has commenced or will shortly commence arbitration in London as provided for in the charter party. (*See* id. at ¶ 10).

11. In addition, Petitioner also intends to commence actions to seek security through attachment actions in support of the arbitration proceedings in England and wherever else assets of Success Superior Limited may be located. (*See* id. at ¶ 11).

10. The proceedings in London and elsewhere are currently pending or are within reasonable contemplation, as required by 28 U.S.C §1782(a). .

11. As is established in the accompanying materials, the New York Banks are believed to possess documents relevant to the foreign attachment and enforcement proceedings, including but not limited to wire transfer information concerning Success Superior Limited, its paying agent(s) and apparent alter ego(s), as well as known counterparties. Such information will be used to identify, in particular, the location of bank accounts and other assets, the names of vessels on charter by Success Superior Limited for which it is or was paying hire or freight, the purchase of bunkers on board such chartered vessels, and the identity of counterparties receiving and/or making payments on its behalf.

426548.1

12.     Such information will be used in order to identify assets to attach as security in support of the foreign arbitration proceedings. (*See* id. at ¶ 12).

13.     Success Superior Limited is in the business of trading and transporting iron ore internationally.

14.     Success Superior Limited is, upon information and belief, an affiliate, paying agent and/or alter ego of Mingli, and/or vice versa.

15.     Like Success Superior Limited, Mingli is in the business of mining, processing, trading, storage and logistics of iron ore internationally.

16.     The shareholder of Success Superior Limited, Lin ("Jack") Xiang, is believed to be a principal of Mingli.

17.     Mingli guaranteed Success Superior Limited's performance of the underlying charter party as well as three other charter parties with JSCL. (*See* id. at ¶ 4 and at Ex. 1 thereto).

18.     In connection with the three other charter parties, JSCL, as "Owners", Success Superior Limited, as "Charterers", and Mingli as "Guarantors of the Charterers" executed a settlement agreement dated June 5, 2014. Pursuant to that settlement agreement, Success Superior Limited and Mingli each undertook an obligation to pay JSCL USD 1,800,000 but Success Superior Limited remitted the entire settlement sum to JSCL in satisfaction of its own as well as Mingli's indebtedness to JSCL.

16.     Based on the foregoing, wire transfer and other banking transaction information concerning Success Superior Limited and Mingli identifying assets belonging to Success Superior Limited are likely to be in the hands of certain financial institutions in New York.

4

426548.1

Such information will be used to demonstrate payments made and/or received by paying agents and/or alter ego entities on behalf of or for the benefit of Success Superior Limited and will identify vessels chartered to or for the benefit of Success Superior Limited. The subject discovery is also likely to reveal the location of assets of Success Superior Limited which can be garnished as security in favor of Petitioner.

17. Obtaining the above information will allow JSCL to determine where to initiate foreign attachment proceedings and seek ultimate enforcement of the arbitral award anticipated to be entered in favor of JSCL and against Success Superior Limited.

## REQUEST FOR RELIEF

18. JSCL requests that the Court provide discovery assistance with respect to the non-U.S. attachment and enforcement proceedings.

19. JSCL requests that the New York Banks, which are present in the Southern District of New York, be directed to provide the discovery described below in support of the non-U.S. attachment and enforcement proceedings.

20. As set forth in more detail in JSCL's Memorandum of Law in Support of Petition for an Order Under 28 U.S.C. § 1782, assistance is appropriate here because: (i) the New York Banks from which discovery is sought reside in or are found in this District; (ii) JSCL is an "interested person" within the meaning of 28 U.S.C. § 1782 (as a party to the non-U.S. proceedings); and (iii) the non-U.S proceedings are reasonably contemplated to be commenced before a "foreign or international tribunal," and the information obtained pursuant to this Petition will be used in support of and introduced in the foreign proceedings.

426548.1

WHEREFORE, pursuant to 28 U.S.C. §1782, JSCL requests that this Court enter an Order:

i. authorizing JSCL to conduct limited discovery pursuant to 28 U.S.C. § 1782 and the Federal Rules of Civil Procedure regarding wire transfer and other financial documents, materials and information concerning:

  a. Success Superior Limited; and

  b. Mingli International Group S. de R.L. de C.V.

  held by persons and/or entities, including the New York Banks, within the jurisdiction of this Court and as set forth in the Proposed Order;

ii. directing the New York Banks to comply with any discovery authorized by this Court's Order in accordance with the Federal Rules of Civil Procedure and the Rules of this Court;

iii. appointing the undersigned counsel, to issue appropriate subpoenas to obtain the discovery authorized by this Court's Order;

iv. providing that this Court shall retain jurisdiction over this matter as is necessary to enforce the terms of any discovery authorized by this Court's Order; and

v. granting the Petitioner such other and further relief as the Court deems just, equitable and proper.

426548.1

Dated: New York, New York
December 18, 2014

                              FREEHILL, HOGAN & MAHAR LLP
                              Attorneys for Petitioner
                              Jiangsu Steamship Co., Ltd

By: _____
                              Michael E. Unger
                              Susan Lee
                              80 Pine Street
                              New York, New York 10005
                              Tel.: (212) 425-1900
                              Fax: (212) 425-1901
                              Email: unger@freehill.com
                                            lee@freehill.com

426548.1

# EXHIBIT A

Petition For An Order Allowing Discovery
Pursuant To 28 U.S.C. § 1782

395-14/MEU
FREEHILL HOGAN & MAHAR LLP
Attorneys for Petitioner
Jiangsu Steamship Co., Ltd
80 Pine Street
New York, NY 10005
Tel.: (212) 425-1900
Fax: (212) 425-1901
Michael E. Unger
Susan Lee
Email: unger@freehill.com
       lee@freehill.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

14 Misc. _____ (___)(___)

IN RE THE PETITION OF JIANGSU STEAMSHIP CO., LTD

REQUEST FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782

------------------------------------------------------------x

## DECLARATION OF SU YIN ANAND
## IN SUPPORT OF
## PETITION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782

I, Su Yin Anand, pursuant to Section 1748 of Title 28 of the United States Code, hereby declare and say the following under penalty of perjury:

1.     I am a partner in the Hong Kong office of Ince & Co. I have had conduct of this matter on behalf of the Petitioner in this action, Jiangsu Steamship Co., Ltd (hereinafter "Petitioner") in connection with a contemplated London arbitration proceeding soon to be brought by Petitioner against Success Superior Limited.

2.     I make this Declaration in support of Petitioner's application for discovery pursuant to 28 U.S.C. § 1782.

426545.1

3. The information contained in this Declaration is true to the best of my knowledge and belief.

4. This matter concerns a claim by Petitioner, as disponent owner of the M/V JIAN HUA, against Success Superior Limited arising out of a charter party entered into between the parties on or about 4 April 2014. Success Superior Limited's performance of the charter party was and is guaranteed by Mingli International Group S. de R.L. de C.V. A true and correct copy of the charter party fixture is attached hereto as Exhibit 1.

5. The charter party is governed by English law and provides for any disputes arising between the parties to be referred to arbitration in London. (*See* Exhibit 1).

6. Pursuant to the charter party, Petitioner agreed to carry 70,000 metric tons of iron ore in bulk on board the M/V JIAN HUA from Manzanillo, Mexico to a port in North China.

7. Petitioner duly delivered the vessel into the service of Success Superior Limited and performed all of its obligations under the charter party.

8. Due to no fault of Petitioner, when the vessel arrived at Manzanillo to load the cargo of iron ore, the vessel was detained and the cargo was impounded by local authorities as a result of an alleged discrepancy in the export documentation.

9. Despite due demand, Success Superior Limited has refused or otherwise failed to pay certain sums to Petitioner in breach of the charter party.

10. Consequently, Petitioner has commenced or will shortly commence arbitration in London as provided for in the charter party.

11. In addition, Petitioner also intends to commence actions to seek security through attachment actions in support of the arbitration proceedings in England and wherever else assets of Success Superior Limited may be located.

426545.1

12. The discovery sought in this action will be used in aid of the foreign arbitration proceedings in order to identify assets which may then be attached as security which Petitioner will then act against in satisfaction of the arbitral award expected to be obtained against Success Superior Limited and in favor of Petitioner.

I declare, under the penalty of perjury of the laws of the United States of America, the contents of this Declaration are true to the best of my knowledge and belief.

Dated: Hong Kong
       18th day of December, 2014

_____
Su Yin Anand

# EXHIBIT 1

**Declaration of Su Yin Anand In Support Of Petition For Discovery Pursuant To 28 U.S.C. § 1782**

From our link to yours..

## FIXTURE NOTE

(CONTRACT NO :131128)

IT IS ON THIS DAY 4 APR 2014, THAT MUTUALLY AGREED AND CONFIRMED BY AND BETWEEN THE SIGNATORIES BELOW ON THE FOLLOWING TERMS AND CONDITIONS: -

于二0一四年四月四日起双方就租船事宜达成如下协议：

| | | |
|---|---|---|
| THE OWNER 船东 | : | JIANGSU STEAMSHIP CO.,LTD |
| ADDRESS 地址 | : | NO.88 ZHONGHUA ROAD,ZHANGJIAGANG, FREE –TRADE ZONE, JIANGSU, CHINA |
| REP. BY 代理人 | : | ZHAO BAOAN |
| TITLE 职务 | : | VICE MANAGER |

HEREINAFTER REFERRED TO AS "OWNER"

| | | |
|---|---|---|
| THE CHARTERER 租方 | : | SUCCESS SUPERIOR LIMITED |
| ADDRESS 地址 | : | FLAT/RM603 6/F HANG PONT COMMERCIAL BUILDING 31 TONKIN STREET CHEUNG SHA WAN KL |
| REP. BY 代表人 | : | Lin Xiang |
| TITLE 职务 | : | Present |

THE C/P PERFORMANCE ARE GUARANTEED BY MINGLI INTERNATIONAL GROUP S. DE R.L. DE C.V. 以下明丽执行出名明实且出做 HEREINAFTER REFERRED TO AS "CHARTERER"

1. PERFORMING VESSEL :
航名明细如下：

M/V JIAN HUA (建华)

HK FLAG/PORT OF REGISTRY

BUILT SUMITOMO JPN 2000

ABS - IMO NUMBER 9206205

GROSS 38426/NET 24724

DWT DRAFT LADEN M.

73747.0 SUMMER 13.871

75637.0 TROPICAL 14.160

71856.0 WINTER 13.582

LOA 225.00 M/BEAM 32.26 M

TPC (LADEN) 65.4 T/CM

BUNKER CAPACITY F.O.2080.0 M3 AT 85% FULL D.O. 180.0

M3 FRESH WATER CAPACITY 296.0 M3

For and on beha
SUCCESS SU
尊祥

For and on
JIANGSU STI
江苏轮

- 1 -

*From our link to yours..*

GRAIN HOLD CAPACITY 87298.4 M3

SIZE OF HATCHES

1. 16.29MX13.36 M
2. 16.29MX15.03M
3. 16.29MX15.03M
4. 16.29MX15.03M
5. 16.29MX15.03M
6. 16.29MX15.03M
7. 16.29MX15.03M

ALL ABOVE DETAILS ABOUT

2. CARGO: 70000MT IRON ORE IN BULK 10% MOLOO
   货物：70000 吨散装铁矿 10%增减由船东选择

3. LAYCAN: 15th/Apr 2014 – 20th/Apr., 2014 unless commence loading early
   受载期：2014 年 4 月 15 日-2104 年 4 月 20 日，除非提前开始装货。

4. LOADING PORT: 1 SB, 1 SP, MANZANILLO, MEXICO
   装港：墨西哥，曼萨尼约的一个安全港口的一个安全泊位。

5. DISCHARGING PORT: 1 SP, 1SB NORTH CHINA PORT (NORTH OF NINGBO).
   卸港：中国北方的一个安全港口的一个安全泊位(宁波以北)。

6. FREIGHT:
   运费：
   A) USD23 PMT FIOST BSS LOADING  1SB, 1 SP, MANZANILLO, MEXICO  DISCHARGING 1SB, 1SP, NORTH CHINA PORT
   A) 23 美金每公吨基于墨西哥，曼萨尼约一港 TUM3# 一泊位装，北中国一港一泊位卸，船东不负责装港费，卸货费，理舱费和平舱费。

7. FULL FREIGHT WILL BE PAID WITHIN 15 DAYS AFTER COMPLETION OF LOADING. FREIGHT PAYABLE AS PER CHARTER PARTY, BUT ALWAYS BEFORE BREAK BULK.
   在装完货后的十五个自然日内根据租船合同支付全部运费至船东指定账户，且必须在开仓卸货之前。

8. FREIGHT DEEMED EARNED ONCE CARGO ON BOARD, NON-RETURNABLE, NON- DEDUCTABLE, WHETHER CARGO/VESSEL LOSS OR NOT.
   货物一旦装船，不论货物/船舶灭失与否，运费视为船东已经赚得且不可退还，不可扣除。

9. CARGO QUANTITY AND FREIGHT CALCULATION SUBJECT TO SHPPER'S SURVEY REPORT JOINLY WITH SHIP MASTER
   货物数量和运费计算以发货人指定的检验人员与船长的联合水尺检验报告为准。

10. LOADING RATE: 13,000 MT PWWD SHING,
    装率：13,000 吨每个晴天工作日，礼拜日节假日计算在内。

- 2 -

From our link to yours..

11. DISCHARGING RATE: 22,000 MT PWWD SHING,
    卸率：22000 吨每晴天工作日，礼拜日节假日计算在内

12. DEMURRAGE/DES : USD12,500/DHD OR PRO-RATA NON-REVERSIBLE, ONCE DEMURRAGE ALWAYS DEMURRAGE.
    滞期费 速遣费：USD12500.00 每天，每小时按比率计算，不可逆转，一旦滞期永远滞期。

13. HATCHS OPENING AND CLOSING TO BE SHIP'S CREW AND AT OWNR'S ACCOUNT BENDS.
    装卸港船长，货舱开关舱由船东负责。

14. NOTICE OF READINESS TO BE TENDERED ALL TIME DAY AND NIGHT, SUNDAYS AND HOLIDAYS INCLUDED, UPON THE TIME VESSEL ARRIVAL AT PILOT STATION. WWWW. LAYTIME TO COMMENCE AFTER 24 HOURS OF TENDERING NOR AT LOADING PORT , LAYTIME TO BE COMMENCE AFTER 12 HOURS OF TENDERING NOR AT DISCHARGING PORT, UNLESS SOONER COMMENCED, IN WHICH CASE, ACTUAL TIME USED TO BE COUNT AS LAYTIME. CARGO QUANTITY TO BE ASCERTAINED BY MEANS OF DRAFT SURVEY BENDS AND SUCH FIGURES AT LOAD PORT TO BE INSERTED INTO BS/L.CGO QTY LOADED TB ASCERTAINED BY JOINT DRAFT SURVEY BY SHIPSIDE N SHPPR'S SURVEYOR, TIME FOR DRAFT SURVEY NOT TO COUNT.
    装卸状况是，卸港时递交准备就绪通知书，无论任何时间，无论是否有在港内，无论是否在泊位，无论是否天气好，无论是否免检，准备就绪通知书的递交不受任何时间限制。装/卸港装卸时间起算：装港了准备就绪通知书递交后 24 小时后开始起算，卸港在准备通知书递交后 12 个小时开始起算，如提早，即装货前开始，按照实际开始装货的时间计算。货物数量在装卸港都以联合水尺计量为准，并将正式提单。联合水尺计量由船方，发货方双方执行并出，水尺时间不算入装卸时间。

15 CHARTERER GUARANTEE THAT CARGO AND THE DOCUMENTS MUST BE READY FOR LOADING BEFORE VESSEL'S ARRIVAL AND COMMENCE LOADING 5 DAYS WITHIN VESSEL ARRIVAL LOADING PORT. IF NOT COMMENCE LOADING WITHIN 5 DAYS OF VESSEL ARRIVAL, CHARTERER SHOULD PAY DEM OF USD 12,500 PER DAY EVERY 5 DAYS IN ADVANCE, OTHERWISE OWNER HAS RIGHT TO WITHDRAW THE VESSEL WITH AN NOTICE BY TELEX OF FAX, AND OWR HAVE FURTHER RIGHTS TO CLAIM ALL THE LOSS CUASED BY
    租家保证所有货物及装货单证在船舶到港准备妥当，并保证在船舶抵达后的 5 天以内装货，如果在船舶抵达后 5 天以内没有装货，租家应每 5 天预付 12500 美元/天的延滞费，否则船东有权以电传或传真方式宣告撤船并索赔一切损失。

16 EXCEPT CHARTERERS ALREADY PAID DEM DUE TO WAIT FOR COMMENCED LOADING OVER THEN EVERY 5 DAYS, REMAINING DEM/DTN/DES IF ANY OCCURRED AT LOADING PORT TO BE SETTLED TOGETHER WITH BALANCE FREIGHT AFTER COMPLETED LOADING.  SAME IF ANY OCCURRED AT DISCHARGING PORT TO BE SETTLED WITHIN 7 DAYS AFTER COMPLETION OF DISCHARGING WHICH TO BE PROVED BY OWNER'S SUPPORTING DOCUMENTS AS NOTICE OF READINESS/ STATEMENT OF FACT WHICH SIGNED AND CONFIRMED BY THE SHIPPING AGENCY BENDS.
    装港除去租家已经支付的由于等待开始装货超过每 5 天的延滞费，余下发生在装卸港的滞期费/亏舱费、速遣费等于装完货后随余运费一并结算，同样地，如在卸货港发生上述，这个费用将于卸完货后 7 天内结算，即时由东需提供相关如下代理确认并签署的文件：装卸准备就绪通知书，装卸事实记录。

17 CHARTERER'S AGENT AT LOADING PORT SUB TO REASONABLE PDA, OWNER'S AGENT AT DISCHARGING PORT.
    以上合同的港口事项，装港为租家代理，卸货港为船东代理。

*From our link to yours..*

18. CARGO TO BE RELEASED AGAINST ORIGINAL OCEAN BS/L WITH DULY ENDORSMENT. IN THE EVENT OF NON-PRESENTATION OF ORIGINAL BILL OF LADING AT DISCHARGE PORT OWING TO THE DELAY OF BILL(S) SENDING, OWNERS WILL DISCHARGE THE ENTIRE CARGO INTO THE CUSTODY FIRSTLY AGAINST CHARTERER'S SINGLE LOI IN ACCORDANCE WITH OWNER'S WORDING, AND THEN RELEASE CARGO AGAINST ORIGINAL B/LS WITH DULY ENDORSMENT
    凭正本有背书的正本提单放货。如果正本提单不能在船舶抵达卸港前到达卸货港，船长和船东将同意首先有正本提单的情况下开始卸货，但前提是租船人必须在其以船东保赔协会发行的范本为格式的正本保函并签字盖章。船东在卸货港凭已经背书的正本提单放货。

19. THE OWNER GUARANTEE VESSEL IS EQUIPPED WITH GOOD-CONDITION AND SUFFICIENT FACILITIES FULLY SUITABLE FOR LOADING BULK CARGO IN HOLDS AND TO PROVIDE SUFFICIENT LIGHTS AS ON BOARD FOR NIGHT WORKS AND FREE USE OF WHICH IN GOOD WORKING CONDITIONS.
    船东保证船上装备了足够的随时可用的良好的设施用来装货并提供足够照明用于夜间装货。

20. VESSEL'S HOLDS SHALL BE READY FOR LOADING BULK CARGO BEFORE LOADING COMMENCES. IF HOLDS ARE NOT READY LAYTIME NOT COUNT UNTIL HOLDS READY.
    空舱应在装货前准备好装货，如果货舱未备好，装货时间将在备妥后起算。

21. TAXES DUES CHARGES ON CARGO TO BE CHARTERERS ACCOUNTS. SAME ON VESSEL FREIGHT OWNER'S ACCOUNT.
    由于货物产生的税费由租家支付，由于运费产生的税费由船东支付。

22. OWNER OR MASTER TO GIVE AGENT AND CHARTERER'S VESSEL ETA NOTICE 5/3/2/1 DAYS BEFORE VSLS ARRIVAL AT LOADING PORT.
    船东或船长将给代理以及租家 5/3/2/1 的预计到装港的到港时间

23. LIGHTERING/LIGHTERAGE IF ANY TO SUFFICE THE DRAFT LIMIT IN BOTH LOADING AND DISCHARGE PORT, TO BE FOR CHTRS ACCOUNT AND ARRANGEMENT, AND TIME FOR LIGHTERAGE/LIGHTENING SHOULD BE COUNTED AS LAYTIME.
    如果因为装货或卸货港的吃水限制需要减载，减载将由租家安排并支付相关费用，减载的时间将算作装卸时间

24. G/A ARBITRATION IF ANY TO BE SETTLED IN HONGKONG WITH ENGLISH LAW TO APPLY.
    如果有共同海损仲裁的将在香港根据英国法仲裁。

25. OTHERS AS PER CLEAN GENCON CP94.
    其它条款与未改的金康 94 格式一样

26. THE ABOVE CONTRACT WILL BE SIGNED BY FAX AND HAS THE SAME FORCE AND EFFECT AS ORIGINAL CONTRACT.
    以上合同传真件签字后与原件同样具有法律效力。

END
完

FOR AND ON BEHALF OF THE OWNER:
*For and on behalf of*
JIANGSU STEAMSHIP COMPANY LIMITED
江 苏 轮 船 股 份 有 限 公 司

............................................
*Authorized Signature(s)*

FOR AND ON BEHALF OF THE CHARTERER :

*For and on behalf of*
SUCCESS SUPERIOR LIMITED
尊 祥 有 限 公 司

............................................
*Authorized Signature(s)*

4

| 1. Shipbroker | RECOMMENDED<br>THE BALTIC AND INTERNATIONAL MARITIME COUNCIL<br>UNIFORM GENERAL CHARTER (AS REVISED 1922, 1976 and 1994)<br>(To be used for trades for which no specially approved form is in force)<br>CODE NAME: "GENCON"  Part I |
|---|---|
| | 2. Place and date |
| 3. Owners/Place of business (Cl. 1) | 4. Charterers/Place of business (Cl. 1) |
| 5. Vessel's name (Cl. 1) | 6. GT/NT (Cl. 1) |
| 7. DWT all told on summer load line in metric tons (abt.) (Cl. 1) | 8. Present position (Cl. 1) |
| 9. Expected ready to load (abt.) (Cl. 1) | |
| 10. Loading port or place (Cl. 1) | 11. Discharging port or place (Cl. 1) |
| 12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo") (Cl. 1) ||
| 13. Freight rate (also state whether freight prepaid or payable on delivery) (Cl. 4) | 14. Freight payment (state currency and method of payment; also beneficiary and bank account) (Cl. 4) |
| 15. State if vessel's cargo handling gear shall not be used (Cl. 5) | 16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b). If total laytime for load. and disch., fill in c) only) (Cl. 6) |
| 17. Shippers/Place of business (Cl. 6) | a) Laytime for loading |
| 18. Agents (loading) (Cl. 6) | b) Laytime for discharging |
| 19. Agents (discharging) (Cl. 6) | c) Total laytime for loading and discharging |
| 20. Demurrage rate and manner payable (loading and discharging) (Cl. 7) | 21. Cancelling date (Cl. 9) |
| | 22. General Average to be adjusted at (Cl. 12) |
| 23. Freight Tax (state if for the Owners' account) (Cl. 13 (c)) | 24. Brokerage commission and to whom payable (Cl. 15) |
| 25. Law and Arbitration (state 19 (a), 19 (b) or 19 (c) of Cl. 19; if 19 (c) agreed also state Place of Arbitration) (if not filled in 19 (a) shall apply) (Cl. 19) | |
| (a) State maximum amount for small claims/shortened arbitration (Cl. 19) | 26. Additional clauses covering special provisions, if agreed |

Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter Party which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | |

# PART II
## "Gencon" Charter (As Revised 1922, 1976 and 1994)

1. It is agreed between the party mentioned in Box 3 as the Owners of the Vessel named in Box 5, of the GT/NT indicated in Box 6 and carrying about the number of metric tons of deadweight capacity all told on summer loadline stated in Box 7, now in position as stated in Box 8 and expected ready to load under this Charter Party about the date indicated in Box 9, and the party mentioned as the Charterers in Box 4 that:
The said Vessel shall, as soon as her prior commitments have been completed, proceed to the loading port(s) or place(s) stated in Box 10 or so near thereto as she may safely get and lie always afloat, and there load a full and complete cargo (if shipment of deck cargo agreed same to be at the Charterers' risk and responsibility) as stated in Box 12, which the Charterers bind themselves to ship, and being so loaded the Vessel shall proceed to the discharging port(s) or place(s) stated in Box 11 as ordered on signing Bills of Lading, or so near thereto as she may safely get and lie always afloat, and there deliver the cargo.

2. **Owners' Responsibility Clause**
The Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by personal want of due diligence on the part of the Owners or their Manager to make the Vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied, or by the personal act or default of the Owners or their Manager.
And the Owners are not responsible for loss, damage or delay arising from any other cause whatsoever, even from the neglect or default of the Master or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this Clause, be responsible, or from unseaworthiness of the Vessel on loading or commencement of the voyage or at any time whatsoever.

3. **Deviation Clause**
The Vessel has liberty to call at any port or ports in any order, for any purpose, to sail without pilots, to tow and/or assist Vessels in all situations, and also to deviate for the purpose of saving life and/or property.

4. **Payment of Freight**
(a) The freight at the rate stated in Box 13 shall be paid in cash calculated on the intaken quantity of cargo.
(b) *Prepaid.* If according to Box 13 freight is to be paid on shipment, it shall be deemed earned and non-returnable, Vessel and/or cargo lost or not lost.
Neither the Owners nor their agents shall be required to sign or endorse bills of lading showing freight prepaid unless the freight due to the Owners has actually been paid.
(c) *On delivery.* If according to Box 13 freight, or part thereof, is payable at destination it shall not be deemed earned until the cargo is thus delivered. Notwithstanding the provisions under (a), if freight or part thereof is payable on delivery of the cargo the Charterers shall have the option of paying the freight on delivered weight/quantity provided such option is declared before breaking bulk and the weight/quantity can be ascertained by official weighing machine, joint draft survey or tally.
Cash for Vessel's ordinary disbursements at the port of loading to be advanced by the Charterers, if required, at highest current rate of exchange, subject to two (2) per cent to cover insurance and other expenses.

5. **Loading/Discharging**
(a) Costs/Risks
The cargo shall be brought into the holds, loaded, stowed and/or trimmed, tallied, lashed and/or secured and taken from the holds and discharged by the Charterers, free of any risk, liability and expense whatsoever to the Owners. The Charterers shall provide and lay all dunnage material as required for the proper stowage and protection of the cargo on board, the Owners allowing the use of all dunnage available on board. The Charterers shall be responsible for and pay the cost of removing their dunnage after discharge of the cargo under this Charter Party and time to count until dunnage has been removed.
(b) Cargo Handling Gear
Unless the Vessel is gearless or unless it has been agreed between the parties that the Vessel's gear shall not be used and stated as such in Box 15, the Owners shall throughout the duration of loading/discharging give free use of the Vessel's cargo handling gear and of sufficient motive power to operate all such cargo handling gear. All such equipment to be in good working order. Unless caused by negligence of the stevedores, time lost by breakdown of the Vessel's cargo handling gear or motive power - pro rata the total number of cranes/winches required at that time for the loading/discharging of cargo under this Charter Party - shall not count as laytime or time on demurrage.
On request the Owners shall provide free of charge cranemen/winchmen from the crew to operate the Vessel's cargo handling gear, unless local regulations prohibit this, in which latter event shore labourers shall be for the account of the Charterers. Cranemen/winchmen shall be under the Charterers' risk and responsibility and as stevedores to be deemed as their servants but shall always work under the supervision of the Master.
(c) Stevedore Damage
The Charterers shall be responsible for damage (beyond ordinary wear and tear) to any part of the Vessel caused by Stevedores. Such damage shall be notified as soon as reasonably possible by the Master to the Charterers or their agents and to their Stevedores, failing which the Charterers shall not be held responsible. The Master shall endeavour to obtain the Stevedores' written acknowledgement of liability.
The Charterers are obliged to repair any stevedore damage prior to completion of the voyage, but must repair stevedore damage affecting the Vessel's seaworthiness or class before the Vessel sails from the port where such damage was caused or found. All additional expenses incurred shall be for the account of the Charterers and any time lost shall be for the account of and shall be paid to the Owners by the Charterers at the demurrage rate.

6. **Laytime**
* (a) *Separate laytime for loading and discharging*
The cargo shall be loaded within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.
The cargo shall be discharged within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.
* (b) *Total laytime for loading and discharging*
The cargo shall be loaded and discharged within the number of total running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.
(c) *Commencement of laytime (loading and discharging)*
Laytime for loading and discharging shall commence at 13.00 hours, if notice of readiness is given up to and including 12.00 hours, and at 06.00 hours next working day if notice given during office hours after 12.00 hours. Notice of readiness at loading port to be given to the Shippers named in Box 17 or if not named, to the Charterers or their agents named in Box 18. Notice of readiness at the discharging port to be given to the Receivers or, if not known, to the Charterers or their agents named in Box 19.
If the loading/discharging berth is not available on the Vessel's arrival at or off the port of loading/discharging, the Vessel shall be entitled to give notice of readiness within ordinary office hours on arrival there, whether in free pratique or not, whether customs cleared or not. Laytime or time on demurrage shall then count as if she were in berth and in all respects ready for loading/discharging provided that the Master warrants that she is in fact ready in all respects. Time used in moving from the place of waiting to the loading/discharging berth shall not count as laytime.
If, after inspection, the Vessel is found not to be ready in all respects to load/discharge time lost after the discovery thereof until the Vessel is again ready to load/discharge shall not count as laytime.
Time used before commencement of laytime shall count.
* *Indicate alternative (a) or (b) as agreed, in Box 16.*

7. **Demurrage**
Demurrage at the loading and discharging port is payable by the Charterers at the rate stated in Box 20 in the manner stated in Box 20 per day or pro rata for any part of a day. Demurrage shall fall due day by day and shall be payable upon receipt of the Owners' invoice.
In the event the demurrage is not paid in accordance with the above, the Owners shall give the Charterers 96 running hours written notice to rectify the failure. If the demurrage is not paid at the expiration of this time limit and if the vessel is in or at the loading port, the Owners are entitled at any time to terminate the Charter Party and claim damages for any losses caused thereby.

8. **Lien Clause**
The Owners shall have a lien on the cargo and on all sub-freights payable in respect of the cargo, for freight, deadfreight, demurrage, claims for damages and for all other amounts due under this Charter Party including costs of recovering same.

9. **Cancelling Clause**
(a) Should the Vessel not be ready to load (whether in berth or not) on the cancelling date indicated in Box 21, the Charterers shall have the option of cancelling this Charter Party.
(b) Should the Owners anticipate that, despite the exercise of due diligence, the Vessel will not be ready to load by the cancelling date, they shall notify the Charterers thereof without delay stating the expected date of the Vessel's readiness to load and asking whether the Charterers will exercise their option of cancelling the Charter Party, or agree to a new cancelling date.
Such option must be declared by the Charterers within 48 running hours after the receipt of the Owners' notice. If the Charterers do not exercise their option of cancelling, then this Charter Party shall be deemed to be amended such that

## PART II
"Gencon" Charter (As Revised 1922, 1976 and 1994)

the seventh day after the new readiness date stated in the Owners' notification to the Charterers shall be the new cancelling date.
The provisions of sub-clause (b) of this Clause shall operate only once, and in case of the Vessel's further delay, the Charterers shall have the option of cancelling the Charter Party as per sub-clause (a) of this Clause.

**10. Bills of Lading**
Bills of Lading shall be presented and signed by the Master as per the "Congenbill" Bill of Lading form, Edition 1994, without prejudice to this Charter Party, or by the Owners' agents provided written authority has been given by Owners to the agents, a copy of which is to be furnished to the Charterers. The Charterers shall indemnify the Owners against all consequences or liabilities that may arise from the signing of bills of lading as presented to the extent that the terms or contents of such bills of lading impose or result in the imposition of more onerous liabilities upon the Owners than those assumed by the Owners under this Charter Party.

**11. Both-to-Blame Collision Clause**
If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Owners in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Owners against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Owners. The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

**12. General Average and New Jason Clause**
General Average shall be adjusted in London unless otherwise agreed in Box 22 according to York-Antwerp Rules 1994 and any subsequent modification thereof. Proprietors of cargo to pay the cargo's share in the general expenses even if same have been necessitated through neglect or default of the Owners' servants (see Clause 2).
If General Average is to be adjusted in accordance with the law and practice of the United States of America, the following Clause shall apply: "In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo shippers, consignees or the owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Owners, or their agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Owners before delivery.".

**13. Taxes and Dues Clause**
(a) *On Vessel* -The Owners shall pay all dues, charges and taxes customarily levied on the Vessel, howsoever the amount thereof may be assessed.
(b) *On cargo* -The Charterers shall pay all dues, charges, duties and taxes customarily levied on the cargo, howsoever the amount thereof may be assessed.
(c) *On freight* -Unless otherwise agreed in Box 23, taxes levied on the freight shall be for the Charterers' account.

**14. Agency**
In every case the Owners shall appoint their own Agent both at the port of loading and the port of discharge.

**15. Brokerage**
A brokerage commission at the rate stated in Box 24 on the freight, dead-freight and demurrage earned is due to the party mentioned in Box 24.
In case of non-execution 1/3 of the brokerage on the estimated amount of freight to be paid by the party responsible for such non-execution to the Brokers as indemnity for the latter's expenses and work. In case of more voyages the amount of indemnity to be agreed.

**16. General Strike Clause**
(a) If there is a strike or lock-out affecting or preventing the actual loading of the cargo, or any part of it, when the Vessel is ready to proceed from her last port or at any time during the voyage to the port or ports of loading or after her arrival there, the Master or the Owners may ask the Charterers to declare, that they agree to reckon the laydays as if there were no strike or lock-out. Unless the Charterers have given such declaration in writing (by telegram, if necessary) within 24 hours, the Owners shall have the option of cancelling this Charter Party. If part cargo has already been loaded, the Owners must proceed with same, (freight payable on loaded quantity only) having liberty to complete with other cargo on the way for their own account.
(b) If there is a strike or lock-out affecting or preventing the actual discharging of the cargo on or after the Vessel's arrival at or off port of discharge and same has not been settled within 48 hours, the Charterers shall have the option of keeping the Vessel waiting until such strike or lock-out is at an end against paying half demurrage after expiration of the time provided for discharging until the strike or lock-out terminates and thereafter full demurrage shall be payable until the completion of discharging, or of ordering the Vessel to a safe port where she can safely discharge without risk of being detained by strike or lock-out. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the strike or lock-out affecting the discharge. On delivery of the cargo at such port, all conditions of this Charter Party and of the Bill of Lading shall apply and the Vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance to the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.
(c) Except for the obligations described above, neither the Charterers nor the Owners shall be responsible for the consequences of any strikes or lock-outs preventing or affecting the actual loading or discharging of the cargo.

**17. War Risks ("Voywar 1993")**
(1) For the purpose of this Clause, the words:
   (a) The "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and
   (b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all Vessels or imposed selectively against Vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.
(2) If at any time before the Vessel commences loading, it appears that, in the reasonable judgement of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks; provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterers the Vessel, her cargo, crew, or other persons onboard the Vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.
(3) The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfilment of the Contract of Carriage. The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been

## PART II
"Gencon" Charter (As Revised 1922, 1976 and 1994)

carried to the discharging port and if the extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight. 297-301

(4) If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route. 302-313

(5) The Vessel shall have liberty:- 314
(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions; 315-321
(b) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance; 322-324
(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement; 325-330
(d) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier; 331-332
(e) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions; 333-335
(f) where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route. 336-340

(6) If in compliance with any of the provisions of sub-clauses (2) to (5) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the Contract of Carriage. 341-344

**18. General Ice Clause** 345
*Port of loading* 346
(a) In the event of the loading port being inaccessible by reason of ice when the Vessel is ready to proceed from her last port or at any time during the voyage or on the Vessel's arrival or in case frost sets in after the Vessel's arrival, the Master for fear of being frozen in is at liberty to leave without cargo, and this Charter Party shall be null and void. 347-351
(b) If during loading the Master, for fear of the Vessel being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to any other port or ports with option of completing cargo for the Owners' benefit for any port or ports including port of discharge. Any part cargo thus loaded under this Charter Party to be forwarded to destination at the Vessel's expense but against payment of freight, provided that no extra expenses be thereby caused to the Charterers, freight being paid on quantity delivered (in proportion if lumpsum), all other conditions as per this Charter Party. 352-360
(c) In case of more than one loading port, and if one or more of the ports are closed by ice, the Master or the Owners to be at liberty either to load the part cargo at the open port and fill up elsewhere for their own account as under section (b) or to declare the Charter Party null and void unless the Charterers agree to load full cargo at the open port. 361-365

*Port of discharge* 366
(a) Should ice prevent the Vessel from reaching port of discharge the Charterers shall have the option of keeping the Vessel waiting until the re-opening of navigation and paying demurrage or of ordering the Vessel to a safe and immediately accessible port where she can safely discharge without risk of detention by ice. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the impossibility of reaching port 367-372

of destination. 373
(b) If during discharging the Master for fear of the Vessel being frozen in deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to the nearest accessible port where she can safely discharge. 374-376
(c) On delivery of the cargo at such port, all conditions of the Bill of Lading shall apply and the Vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion. 377-381

**19. Law and Arbitration** 382
* (a) This Charter Party shall be governed by and construed in accordance with English law and any dispute arising out of this Charter Party shall be referred to arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force. Unless the parties agree upon a sole arbitrator, one arbitrator shall be appointed by each party and the arbitrators so appointed shall appoint a third arbitrator, the decision of the three-man tribunal thus constituted or any two of them, shall be final. On the receipt by one party of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within fourteen days, failing which the decision of the single arbitrator appointed shall be final. 383-393
For disputes where the total amount claimed by either party does not exceed the amount stated in Box 25** the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime Arbitrators Association. 394-397
* (b) This Charter Party shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and should any dispute arise out of this Charter Party, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for purpose of enforcing any award, this agreement may be made a rule of the Court. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc.. 398-406
For disputes where the total amount claimed by either party does not exceed the amount stated in Box 25** the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, Inc.. 407-410
* (c) Any dispute arising out of this Charter Party shall be referred to arbitration at the place indicated in Box 25, subject to the procedures applicable there. The laws of the place indicated in Box 25 shall govern this Charter Party. 411-413
(d) If Box 25 in Part 1 is not filled in, sub-clause (a) of this Clause shall apply. 414
* *(a), (b) and (c) are alternatives; indicate alternative agreed in Box 25.* 415
** *Where no figure is supplied in Box 25 in Part 1, this provision only shall be void but the other provisions of this Clause shall have full force and remain in effect.* 416-417